NATHAN BRENNER, Ill. Bar No. 6317564
STEPHEN W. RODGER, DC Bar No. 485518
ALBERT TENG, DC Bar No. 1021115
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 876-5626
*nbrenner@ftc.gov; srodger@ftc.gov; ateng@ftc.gov*

*Attorneys for Plaintiff Federal Trade Commission*

Additional counsel identified on signature pages in accordance with Local Rule 3-4(a)(1)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON,** and **STATE OF WISCONSIN**

Plaintiffs,

v.

**PLAYPOWER, INC., PLAYPOWER HOLDINGS, INC., PLATINUM EQUITY ADVISORS, LLC, PLATINUM EQUITY CAPITAL PARTNERS VI, L.P., ADVANCE HOLDINGS II, LLC, BCI ACQUISITIONS, INC., BCI BURKE COMPANY, LLC, BERTRAM GROWTH CAPITAL IV, L.P., BERTRAM GROWTH CAPITAL IV-A, L.P.,** and **BERTRAM CAPITAL MANAGEMENT, LLC**

Defendants.

Case No.: 3:26-cv-12072

**COMPLAINT**

**PUBLIC VERSION**

The Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, and the states of Arizona, California, Colorado, Illinois, Nevada, North Carolina, Ohio, Tennessee, Texas, Washington, and Wisconsin and the Commonwealth of Pennsylvania, acting by and through their respective Attorneys General (collectively, "Plaintiff States," and with the FTC, "Plaintiffs"), petition this Court to enter a stipulated temporary restraining order and grant a permanent injunction preventing Platinum Equity Advisors, LLC; Platinum Equity Capital Partners VI, L.P.; and Advance Holdings II, LLC (collectively, "Platinum Equity") and their entities, including, but not limited to, PlayPower Holdings, Inc. and PlayPower, Inc. and their subsidiaries (collectively, "PlayPower") from acquiring BCI Acquisitions, Inc. and BCI Burke Company, LLC (collectively, "Burke") from Bertram Growth Capital IV, L.P.; Bertram Growth Capital IV-A, L.P.; and Bertram Capital Management, LLC (collectively, "Bertram Capital") (the "Proposed Transaction") in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Plaintiffs seek this relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26.

**NATURE OF THE CASE**

1. Platinum Equity and its portfolio company PlayPower propose paying [redacted] to buy Burke, one of PlayPower's closest competitors for the manufacture of commercial outdoor playground equipment. The Proposed Transaction would add the Burke brand to PlayPower's existing brand portfolio, which includes Miracle Recreation Equipment Company ("Miracle"), Little Tikes Commercial ("Little Tikes"), and Playworld Systems, Inc. ("Playworld"), and trigger a structural presumption of illegality based on market concentration. Following decades of consolidation, the Proposed Transaction would threaten higher prices, lower quality and service, and diminished innovation for tens of thousands of schools, parks, churches, and other commercial outdoor playground customers, as well as the tens of millions of American children who use and love playgrounds. These harms will be felt throughout the United States, including in Plaintiff States.

2. Commercial outdoor playgrounds occupy a unique and important place in American public life for children and parents alike. Whether found at a school, park, church, daycare, apartment building, or elsewhere, commercial outdoor playgrounds offer a safe, fun, and durable place for children to play and to build community and friendships. PlayPower recognizes that demand for high-quality, innovative commercial outdoor playgrounds is increasing as "[redacted]" and in response to concerns such as "[redacted]" Parks, schools, churches, and other customers often spend from $50,000 to more than $1 million to purchase commercial outdoor playgrounds.

3. PlayPower's commercial outdoor playground business is the product of three successive acquisitions: Miracle in 1993, Little Tikes in 2004, and Playworld in 2016. Now, facing losses to Burke, PlayPower is once again seeking to buy a disruptive rival instead of outcompeting it. PlayPower's CEO stated the matter in plain terms to PlayPower's private equity owner, Platinum Equity, in early December 2025: "[redacted]" Indeed, the Proposed Transaction's antitrust risk was apparent to deal participants: one even remarked at a Bertram Capital-Burke board meeting, "[redacted]"

4. For its part, Platinum Equity sought to use [redacted] to understand why PlayPower had been losing share to Burke: "[redacted]" In response to PlayPower's request to allow certain of its executives to view [redacted] Burke's CEO exclaimed that "[redacted]

[redacted]"

5. PlayPower competes fiercely with Burke today, and that competition benefits schools, parks, churches, and other playground customers through lower prices, better services, higher quality, and more innovation. But PlayPower is losing ground to Burke, and rather than redouble its competitive efforts against its rival, PlayPower has decided to eliminate the pressure it faces from Burke by acquiring it. Since 2016, Burke's growth outpaced the market [redacted], with revenues growing from [redacted] in 2016 to [redacted] in 2024. As one PlayPower sales representative observed, Burke went "[redacted]" by utilizing "[redacted]" To grow, Burke has attacked PlayPower from all angles—on pricing, quality, service, and innovation, setting its sights on "[redacted]" Through this competition, Burke has taken share from incumbents and has proven itself as a particularly potent competitor to PlayPower. A PlayPower Senior Vice President touted the elimination of Burke, a [redacted] competitor, as one of the [redacted] of the Proposed Transaction: "[redacted]" Burke's own analysis confirms PlayPower's suspicions: per Burke's CEO, its growth has "[redacted]"

6. Likewise, PlayPower's CEO refers to Burke as a "[redacted]" and explains that PlayPower brands and sales representatives "[redacted]" or want to "[redacted]" A PlayPower regional sales manager referred to Burke as PlayPower's "[redacted]" when lamenting a lost sale. To win business from its rival, PlayPower implements initiatives such as "[redacted]" the "[redacted]" and "[redacted]" which include [redacted] to schools, churches, parks, and other customers when PlayPower is competing with Burke for business. PlayPower instructs its sales representatives to

“[redacted]” and routinely approves [redacted] versus Burke to win business. Despite PlayPower’s best efforts to take as much business as possible from Burke, its nemesis has grown.

7. Burke’s growth at PlayPower’s expense is no accident; it is a targeted strike. Burke’s COO boasted: “[redacted]” A presentation prepared by Burke C-suite executives [redacted]”

[redacted]

8. Aware that it must fight back, PlayPower has tried to develop new products to compete with Burke and attempted to improve its customer service and quality to attract and retain customers. Defendants’ documents are rife with examples of PlayPower’s brands competing head-to-head with Burke on price, lead times, quality, and innovation:

- A PlayPower sales director noted that PlayPower documented losses "[redacted]"
- In March 2026, a PlayPower sales representative reported that "[redacted]"
- For its 2026 Annual Operating Plan for the Playworld brand, PlayPower outlined several competitive initiatives to help Playworld grow, including a "[redacted]" initiative, programs to "[redacted]" "[redacted]" and "[redacted]"
- In August 2025, a PlayPower sales manager wrote to her superior that "[redacted]"
- PlayPower's Miracle brand reported in June 2024 that it uses [redacted]"
- PlayPower's CFO weighed in on deviating from the [redacted] to win an opportunity from Burke in 2023, explaining: "[redacted]" PlayPower ultimately made an exception to its [redacted].
- In 2023, Burke's CEO wrote "[redacted]"
- In 2022, a PlayPower sales director described [redacted]: "[redacted]"

- In 2022, a PlayPower independent sales representative exclaimed to PlayPower executives that "[redacted]"
- In 2021, a sales representative emailed PlayPower: "[redacted]"
- In 2021, Burke's CEO told Burke's independent sales representatives: "[redacted]"

9. The elimination of the intense head-to-head rivalry between PlayPower and Burke threatens price, quality, service, and innovation competition. The loss of price competition between Defendants is especially problematic because, as demand for commercial outdoor playgrounds has increased, consolidation has resulted in significant price increases. Today, five companies—including PlayPower and Burke—own over a dozen playground equipment brands and hold 85 to 90 percent market share in the United States. The shrinking pool of independent manufacturers like Burke means an industry where high prices have become the norm. PlayPower, for instance, has "[redacted]" and has "[redacted]" Churches and private schools in particular can be a "[redacted]" according to a PlayPower sales representative. In discussing the justification to sales representatives of a 2026 price increase, PlayPower's CFO noted that "[redacted]"

10. Indeed, PlayPower is not just passing on rising costs. In the words of its third-party pricing consultant, PlayPower is "[redacted]" and PlayPower's pricing "[redacted]" Burke has sought to take advantage of these high prices by winning PlayPower's customers. According to its own analysis, Burke "[redacted]" But even with Burke as a competitive check, PlayPower's

prices have soared. PlayPower's proposed acquisition of a key rival will allow it to charge even higher prices.

11. The likely harm from the Proposed Transaction is not limited to price. Today, Burke sales representatives prize Burke's innovative and high-quality products and robust service and support. As recorded in Defendants' internal documents, Burke sales representatives fear that PlayPower will [redacted]:

- "[redacted]"
- "[redacted]"
- "[redacted]"
- "[redacted]"

12. These fears are well-grounded. After PlayPower acquired Playworld, product quality [redacted] according to an internal Playworld sales representative. Even Playworld's former owner (and then-PlayPower board member) complained about [redacted] post-acquisition: "[redacted]" Unsurprisingly, product innovations for Playworld have also deteriorated because, [redacted], PlayPower has "[redacted]

[redacted]” Indeed, PlayPower’s CEO admits that the three brands now “[redacted]” Another PlayPower executive echoed this sentiment, wistful for the “[redacted]” The consequences for PlayPower’s legacy brands after yet another acquisition may be more dire still; PlayPower’s private equity owner has said: [redacted]”

13. The parties have stipulated to entry of a temporary restraining order to preserve the status quo and protect competition while the Court considers this matter. Plaintiffs bring this action to preserve the fierce competition between PlayPower and Burke that the Proposed Transaction would eliminate if allowed to proceed. Ultimately, the Court should permanently enjoin the Proposed Transaction.

## JURISDICTIONAL STATEMENT

### A. Jurisdiction

14. The Proposed Transaction constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

15. This Court’s jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and it is brought by an agency of the United States authorized by an Act of Congress to bring this action.

16. Defendants are, and at all relevant times have been, engaged in activities in or affecting “commerce” as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

17. In conjunction with the FTC, Plaintiff States bring this action for a permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff States have the

requisite standing to bring this action as *parens patriae* because the Proposed Transaction threatens to cause injury to the general economies of the States of Arizona, California, Colorado, Illinois, Nevada, North Carolina, Ohio, Tennessee, Texas, Washington, and Wisconsin, and the Commonwealth of Pennsylvania. Plaintiff States and local governments and taxpayers within their states are the primary funders of commercial outdoor playgrounds purchased by schools and parks. Plaintiff States all have a quasi-sovereign interest in allowing children within their borders access to safe, affordable, high-quality, and innovative commercial outdoor playgrounds.

**B. Venue**

18. The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute. Fed. R. Civ. P. 4(k)(1)(C). Venue is proper in the Northern District of California under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b). Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein.

**C. Divisional Assignment**

19. Per Civil Local Rule 3-2(c) and the Court's Assignment Plan (General Order No. 44 D(3)), this antitrust case shall be assigned on a district-wide basis.

**PLAINTIFFS**

20. Plaintiff Federal Trade Commission is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41-58, with its principal offices at 600 Pennsylvania Avenue, NW, Washington, DC 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

21. Plaintiff State of Arizona brings this action by and through its Attorney General. The Attorney General of the State of Arizona is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Arizona to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

22. Plaintiff State of California is a sovereign state of the United States. The State of California brings this action by and through its Attorney General, Rob Bonta, who is the chief law enforcement officer of the State, and who has the authority to bring this action on behalf of the State and the people of the State of California to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

23. Plaintiff State of Colorado brings this action by and through its Attorney General, Philip Weiser, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

24. Plaintiff State of Illinois brings this action by and through its Attorney General. The Attorney General of the State of Illinois is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Illinois to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

25. Plaintiff State of Nevada is a sovereign state of the United States. This action is brought by and through its Attorney General, Aaron D. Ford, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Nevada Revised Statutes §§ 598A.050, 598A.070, 598A.080, and 228.380.

26. Plaintiff State of North Carolina brings this action by and through its Attorney General. The Attorney General of the State of North Carolina is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of North Carolina to protect the State, the general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

27. Plaintiff State of Ohio is a sovereign state of the United States. This action is brought by and through its Attorney General, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the

Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of Ohio has its principal offices at 30 East Broad Street, Columbus, Ohio 43215.

28. Plaintiff Commonwealth of Pennsylvania brings this action by and through its Attorney General David W. Sunday, Jr., who is the chief law enforcement officer for the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and the Commonwealth Attorneys Act, 71 P.S. § 732-204(c). The Pennsylvania Attorney General brings this action to protect the Commonwealth, its general economy, and its residents from the anticompetitive effects of the Proposed Transaction.

29. Plaintiff State of Tennessee, by and through its Attorney General, brings this action in its sovereign capacity and as *parens patriae* on behalf of the citizens, general welfare, and economy of the State of Tennessee under its statutory, equitable, and common law powers, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

30. The State of Texas brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents and to prevent and restrain the violation by Defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18.

31. Plaintiff State of Washington is a sovereign state of the United States. This action is brought by and through its Attorney General, Nicholas W. Brown, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State of Washington to protect the State, its general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

32. Plaintiff State of Wisconsin brings this action by and through its Attorney General. The Attorney General of the State of Wisconsin is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Wisconsin to protect

the State, its general economy, and its residents from the anticompetitive effects of the Proposed Transaction, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**DEFENDANTS AND THE PROPOSED TRANSACTION**

33. Defendant Platinum Equity Advisors, LLC manages and makes investments through Defendant Platinum Equity Capital Partners VI, L.P., an affiliated private equity fund that owns PlayPower.[1] Platinum Equity is headquartered in Beverly Hills, California. In October 2025, Platinum Equity acquired Defendant PlayPower Holdings, Inc. Shortly thereafter, on February 8, 2026, Platinum Equity agreed to purchase 100% of Burke's voting securities from Bertram Capital through Defendant Advance Holdings II, LLC for approximately [redacted], adding to a portfolio that already includes three other commercial outdoor playground equipment brands.

34. Defendant PlayPower Holdings, Inc. and its subsidiary PlayPower, Inc. (d/b/a PlayPower) are portfolio companies owned by Platinum Equity and are headquartered in Huntersville, North Carolina.[2] PlayPower owns three commercial outdoor playground equipment brands: Miracle, Little Tikes, and Playworld. PlayPower manufactures its products—including non-playground products—in nine facilities, six of which are located in the United States. In 2025, PlayPower's global net sales were [redacted], with [redacted] in the United States. Of that total, PlayPower generated [redacted] in global commercial outdoor playground equipment sales, with over [redacted] in the United States. PlayPower sells commercial outdoor playground equipment throughout California. In recent years, PlayPower has acquired a number of companies in the broader recreational and outdoor living systems industries, including Playworld in 2016, to "[redacted]" PlayPower's gross profits and margins have

---

[1] As described *supra*, Defendants Platinum Equity Advisors, LLC, Platinum Equity Capital Partners VI, L.P., and Advance Holdings II, LLC are together referred to as Platinum Equity.

[2] As described *supra*, Defendants PlayPower Holdings, Inc. and PlayPower, Inc. are together referred to as PlayPower.

[redacted]—in part due to its price increases to commercial outdoor playground customers.

35. Defendant Bertram Capital Management, LLC manages and makes investments through Bertram Growth Capital IV, L.P., and Bertram Growth Capital IV-A, L.P., which are both affiliated private equity funds that have a majority equity stake in Burke.[3] Bertram Capital is headquartered in the San Francisco Division in Foster City, California. In 2021, Bertram Capital acquired Burke. A Bertram partner and Bertram's CFO are signatories to the Agreement and Plan of Merger for the Proposed Transaction.

36. Defendant BCI Acquisitions, Inc. and its subsidiary BCI Burke Company, LLC (d/b/a Burke) together are a commercial outdoor playground manufacturer based in Fond du Lac, Wisconsin.[4] Burke has seen significant growth over the past decade, expanding its sales to [redacted] what they were ten years ago. Burke operates five facilities with three locations in the United States, including one manufacturing facility in Fond du Lac, Wisconsin. Unlike PlayPower, with its three brands, Burke sells commercial outdoor playground equipment through only the Burke brand in the United States. In 2025, Burke's global sales were [redacted], with [redacted] in the United States. For commercial outdoor playground equipment, Burke generated [redacted] in global revenue, with [redacted] in the United States. Burke sells commercial outdoor playground equipment throughout California. In a press release, Platinum Equity cited Burke's "innovative product set, [] strong management team, and a thriving network of independent reps" as its rationale for the Proposed Transaction.

37. On October 19, 2026, by a 2-0 vote, the Commission found reason to believe that the Proposed Transaction may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15

---

[3] As described *supra*, Defendants Bertram Capital Management, LLC, Bertram Growth Capital IV, L.P., and Bertram Growth Capital IV-A, L.P. are together referred to as Bertram Capital.

[4] As described *supra*, Defendants BCI Acquisitions, Inc. and BCI Burke Company, LLC are together referred to as Burke.

U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act, and authorized the filing of this action.

## COMMERCIAL OUTDOOR PLAYGROUND INDUSTRY

38. PlayPower and Burke manufacture commercial outdoor playground equipment. Unlike residential playgrounds, which serve a single household, commercial outdoor playgrounds are designed to be capable of withstanding years of intensive use by large numbers of children. They are among the most important spaces where American children can gather, play, and interact within their communities. Access to quality commercial outdoor playgrounds supports children's physical health by encouraging active movement and combating childhood obesity. Commercial outdoor playgrounds provide children with a valuable alternative to screen time, helping them build social and emotional skills, stay active, and explore creativity and imagination through play.

39. Purchases of commercial outdoor playgrounds, especially for public schools and parks and recreation departments—the most common buyers of commercial outdoor playground equipment—are mostly funded by public monies, including monies collected from taxes and bonds. Across the country, including in the Plaintiff States, public funds support the purchase of many hundreds of millions of dollars' worth of commercial outdoor playground equipment each year. Indeed, in marketing itself to Platinum Equity, PlayPower highlighted that it has benefited from heightened public spending on commercial outdoor playgrounds: "[redacted]" Higher prices, diminished quality and service, and reduced innovation do not merely burden a single buyer; they strain the local, state, and federal public budgets that support parks, schools, and community programs, and ultimately fall on the taxpayers who fund them. If commercial outdoor playground prices rise, parks, schools, and churches would build fewer new playgrounds and replace or upgrade existing playgrounds less often or would be forced to raise more funds, including taxpayer dollars, for more expensive playground purchases.

40. The commercial outdoor playground industry has undergone significant consolidation over the past 25 years. Like PlayPower, which acquired Little Tikes, Miracle, and Playworld over the last three decades, other manufacturers have likewise acquired competing manufacturers. Consequently, as Platinum Equity recognized, the "[redacted]"

41. Today, there are five major manufacturers of commercial outdoor playground equipment in the United States. PlayPower and PlayCore, Inc. ("PlayCore") are the largest manufacturers of commercial outdoor playground equipment in the United States, and each sells through multiple brands it has acquired. The other three major manufacturers of commercial outdoor playground equipment—Burke, Landscape Structures, Inc. ("Landscape Structures" or "LSI"), and KOMPAN, Inc. ("Kompan")—go to market through a single brand. These five major manufacturers control the vast majority of commercial outdoor playground sales in the United States and predominantly sell "post-and-platform" commercial outdoor playgrounds. Post-and-platform playgrounds feature decks and platforms connected by transitions such as bridges, which allow children to move from one part of the structure to another.



A Burke post-and-platform commercial outdoor playground

42. The five major manufacturers' combined market share has grown in recent years and is expected to keep rising. But the major manufacturers differ in the customer segments and order sizes they target. Defendants focus on and generate a significant share of their orders from small and medium-sized projects, especially for schools, daycares, and other early childhood locations, whereas Landscape Structures and Kompan draw most of their sales from larger budgeted projects.

43. There are also "niche" manufacturers of commercial outdoor playground equipment, whose sales are a fraction of those of the major manufacturers. Niche manufacturers often seek to fill gaps left by the major manufacturers. They specialize, for instance, in rope-based playgrounds, certain high-end custom playgrounds, wood playgrounds, or glass fiber reinforced concrete playgrounds rather than the post-and-platform playgrounds that are the major manufacturers' bread and butter. Niche manufacturers generally lack the product breadth and the sales representative networks of the major manufacturers. They also often lack full product portfolios of essential play-structure components—such as slides or spinners—and in some cases do not manufacture certain essential components at all. Even those niche manufacturers that do

make traditional post-and-platform playgrounds typically do not offer the same safety record, quality, and on-the-ground service that the major manufacturers provide.

44. Most of Defendants' sales (and other major manufacturers' sales) are made with the assistance of independent sales representative firms to which manufacturers grant exclusive rights to market Defendants' products in local territories.[5] Manufacturers are closely intertwined with their sales representatives—for instance, Platinum Equity identified PlayPower's "[redacted]" as an important reason for purchasing PlayPower because it creates "[redacted]" (emphasis in original). Likewise, Burke recognized: "[redacted]" and "[redacted]"

45. In exchange for territorial exclusivity, sales representatives generally agree not to sell competing commercial outdoor playground equipment, particularly the traditional post-and-platform steel and plastic playgrounds predominantly sold by Defendants. PlayPower's and Burke's sales representatives do not sell—and are, in fact, contractually barred from selling—the other's (and certain other third-party manufacturers') commercial outdoor playground equipment.

46. Defendants assign each sales representative firm an exclusive territory in which to sell. These territories often comprise a single state or multiple nearby states. The sales representatives generally operate through either a wholesale model (i.e., the sales representative buys the equipment and resells it to the customer at a markup) or a commission model (i.e., Defendants pay the sales representative a commission based on their sales). In most cases, Defendants ship playgrounds directly to the customer to spare sales representatives the costs of warehousing.

[5] Hereinafter referred to as "sales representatives" or "independent sales representatives."

47. Defendants control new product development, equipment design and quality, and delivery times, among other important manufacturing elements. PlayPower and Burke also set list prices for their sales representatives and, for the sales representatives working under a wholesale model, set the wholesale prices. For sales representatives working under a commission model, manufacturers determine the commission structure, which depends on what discounts the sales representative negotiates before a manufacturer sells the equipment to the customer. Generally, if a customer negotiates a higher discount, the sales representative receives a lower commission. PlayPower and Burke also must approve [redacted] that sales representatives offer to customers.

48. PlayPower and Burke work closely with their sales representatives and provide them with marketing, playground site design, and customer service support, among other services. Each customer has its own unique commercial outdoor playground needs—including the site dimensions on which the playground will be built, the preferences for certain structures or equipment, and the age groups of children likely to use the playground. Customers often collaborate with sales representatives, and, by extension, with their manufacturers, to design a playground that will suit these needs at an acceptable price point. Defendants also work closely with their sales representatives to win business via sales strategies and discounts. Customers frequently entertain multiple offers from sales representatives competing to win their business. Manufacturers and their sales representatives commonly know the competitors they are facing, and Defendants often discount more when they know they are facing each other to win a customer.

49. PlayPower and Burke do not compete against their own sales representatives; rather, the sales representatives act as Defendants' sales force. In states or localities where Burke or a PlayPower brand does not have an independent sales representative firm, Defendants directly employ their own sales representatives. Defendants also sell directly to regional or national customers, although they may utilize their sales representatives to assist with certain aspects of those sales, including installation and customer service.

**THE PROPOSED TRANSACTION IS PRESUMPTIVELY UNLAWFUL BECAUSE IT WILL SIGNIFICANTLY INCREASE MARKET CONCENTRATION**

50. The Proposed Transaction will significantly increase concentration in an already concentrated market for commercial outdoor playground equipment manufactured for sale in the United States. The increase in concentration renders the Proposed Transaction presumptively illegal in a national market.

**A. The Relevant Product Market Is No Broader Than the Manufacture of Commercial Outdoor Playground Equipment**

51. A product market no broader than the manufacture of commercial outdoor playground equipment is a relevant market in which to evaluate the competitive effects of the Proposed Transaction. Commercial outdoor playground equipment is sold to specialized customers like schools, parks and recreation departments, churches, and daycares that buy these playgrounds for use in public or semi-public settings. These specialized customers typically purchase commercial outdoor playground equipment from a manufacturer and a sales representative, who assists the customer with site planning, playground design, excavation, installation, and after-market customer service (e.g., replacing parts).

52. In contrast to residential playground equipment, designed for periodic use by only a few children, commercial outdoor playground equipment is engineered to be durable, high-capacity, and safe enough to withstand years of intensive use, in all types of weather, by large numbers of children. Commercial outdoor playground equipment typically complies with strict safety standards established by bodies such as the Consumer Product Safety Commission and the American Society for Testing and Materials (“ASTM”). Those standards are different from the standards used for residential playground equipment. Compliance with safety standards for commercial outdoor playground equipment is certified by the International Play Equipment Manufacturers Association (“IPEMA”), the largest commercial outdoor playground equipment trade association. Residential playground equipment is not eligible for IPEMA certification.

Commercial outdoor playground equipment is also significantly more expensive than residential playground equipment.

53. Customers, independent sales representatives, and manufacturers do not view residential playground equipment as substitutes for commercial outdoor playground equipment. Commercial outdoor playground manufacturers focus their competitive analyses on other manufacturers of commercial outdoor playground equipment and frequently analyze their market share of commercial outdoor playground sales.

54. Indoor playground equipment is likewise not a substitute for commercial outdoor playground equipment. Indoor playground equipment is not designed for outdoor use and generally would not survive prolonged outdoor use. Customers do not view indoor playground equipment as a substitute for commercial outdoor playground equipment.

55. As explained by the case law and the 2023 U.S. Department of Justice and FTC Merger Guidelines (the "Merger Guidelines"), the hypothetical monopolist test is one tool used to determine if a group of products is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and could profitably undertake a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"), then that group of products is a properly defined antitrust product market. Here, a hypothetical monopolist of the manufacture of commercial outdoor playground equipment—including the major manufacturers and niche manufacturers discussed *supra*—likely would undertake a SSNIPT. In the event of a SSNIPT for the manufacture of commercial outdoor playground equipment, customers would not switch to other products in sufficient volumes to render the price increase unprofitable. Accordingly, the manufacture of commercial outdoor playground equipment is a properly defined product market.

**B. The Relevant Geographic Market Is No Broader Than the United States**

56. A market no broader than the United States is a relevant geographic market in which to assess the Proposed Transaction. Customers in the United States have different

procurement requirements and buying needs than customers in other countries. For instance, customers in the United States often require their commercial outdoor playground manufacturers to comply with certain national or statewide safety and accessibility requirements, including those from the Consumer Product Safety Commission or required by the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213. Customers also often have buy-USA requirements or preferences for commercial outdoor playground equipment made in the United States. In contrast to developing countries, most of the commercial outdoor playground sales in the United States are for replacement playgrounds rather than brand new playground projects.

57. Defendants and other industry participants recognize the United States as a relevant geographic market. For example, Defendants track sales numbers and shares in the United States. And industry participants frequently describe the state of the market in the United States. The manufacturers selling into the United States are also different from those in other countries. For instance, PlayPower primarily sells commercial outdoor playground equipment through a different brand in Europe—HAGS—and faces different competitors in European countries compared to those that PlayPower faces in the United States. Defendants' sales representatives' exclusive territories almost always only cover states in the United States, and not territories in other countries.

58. A hypothetical monopolist of all commercial outdoor playground equipment manufactured for customers in the United States likely could profitably undertake a SSNIPT on some, though not necessarily all, customers in the United States.

### C. The Proposed Transaction Will Increase Market Concentration in an Already Concentrated Market

59. The Proposed Transaction is presumptively unlawful because it significantly increases concentration in a highly concentrated national market.

60. Courts, federal and state agencies, and economists employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms,

each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10{,}000$). The increase in market concentration caused by the Proposed Transaction is indicative of the Proposed Transaction's likely negative impact on competition. The Merger Guidelines and case law explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically, a merger is presumptively unlawful when it meets either of the following two conditions:

- A merger that creates a firm where, in any relevant market, the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points; or
- A merger that creates a firm with a market share of over 30% and that increases the HHI of any relevant market by more than 100 points.

61. The Proposed Transaction is presumptively illegal in a national market for the manufacture of commercial outdoor playground equipment. In a national market for the manufacture of commercial outdoor playground equipment: (1) the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points; and (2) the post-transaction market share for PlayPower will be more than 30%.

**THE PROPOSED TRANSACTION WILL LIKELY ELIMINATE CLOSE AND SUBSTANTIAL HEAD-TO-HEAD COMPETITION**

62. The Proposed Transaction would not only combine two of the largest commercial outdoor playground manufacturers, it would also eliminate the fierce competition between these manufacturers' brands that benefits consumers. Eliminating the competition between PlayPower and Burke likely would result in higher prices and reduced quality, service, and innovation for the schools, parks and recreation departments, churches, daycares, and other customers—and ultimately for the children, parents, and taxpayers—that commercial outdoor playgrounds serve.

The elimination of this competition violates Section 7 of the Clayton Act and Section 5 of the FTC Act, independent of market-share analysis.

**A. PlayPower and Burke Recognize Each Other As Close Competitors**

63. PlayPower and Burke recognize one another as especially close, and often each other's fiercest, competitors. In a 2024 email admonishing a subordinate, PlayPower's CEO wrote that an "[redacted]" After speaking with a number of PlayPower sales representatives in late 2025, a Senior Vice President at Platinum Equity summarized the sales representatives' views on PlayPower's top competitors: "[redacted]" In another example, a PlayPower sales representative stated, "[redacted]" In a document prepared by PlayPower's CEO to analyze the Proposed Transaction, he wrote that a "[redacted] is that "[redacted]" After a 2025 report from a sales representative that "[redacted]" a PlayPower sales director replied, "[redacted]"

64. Burke also recognizes this fierce competition. Burke's CEO wrote in a note for a 2023 sales conference that "[redacted]" During budget discussions with Burke's private equity owner, Bertram Capital, Burke's CEO was unequivocal about who Burke's growth would come from: "[redacted]" Moreover, notes of a 2024 meeting between a Burke sales representative and Burke's CEO reveal that "[redacted]"

65. While it is appropriate to analyze a geographic market no broader than the United States, competitive effects of the Proposed Transaction may be more severe in certain localities, including individual states. In areas where PlayPower and Burke compete especially closely for schools, parks and recreation departments, churches, daycares, and other customers, the Proposed Transaction is likely to cause more acute harm, including higher prices, diminished service, lower quality, and reduced innovation. For example, in an email exchange titled "[redacted]" a then-PlayPower Vice President of Global Sales wrote that "[redacted]" In response, a then-PlayPower Senior Vice President confirmed he spoke to PlayPower's CEO and that "[redacted]" PlayPower has also implemented strategies by state specifically to target Burke, including "[redacted]" discounts used "[redacted]" and a 2025 program where PlayPower offered "[redacted]"

66. These localized competitive effects reinforce the conclusion that the Proposed Transaction is likely to substantially lessen competition in a national market.

67. Likewise, PlayPower and Burke compete fiercely for small and mid-sized projects and customers. For these projects and customers, the Proposed Transaction is likely to have especially severe consequences. For instance, PlayPower's CEO recognized in March of 2025 that Burke is "[redacted]" which buy playgrounds on behalf of parks and schools.

**B. PlayPower and Burke Compete Intensely on Price**

68. PlayPower and Burke are constantly locked in intense head-to-head price competition. PlayPower repeatedly recognizes this competition in its ordinary course documents:

- A then-PlayPower Vice President of Global Sales reported in February 2026 that "[redacted]" He

cited a specific example where "[redacted]"

- In 2026, a PlayPower sales representative reported that: "[redacted]"
- In a 2026 presentation prepared for PlayPower executives, PlayPower noted that "[redacted]"
- In 2026, PlayPower approved an "[redacted]" upon being informed of "[redacted]" from a customer "[redacted]"
- A PlayPower sales director emailed his supervisor in 2025 attaching a "[redacted]"
- A PlayPower regional sales director observed in 2025 that "[redacted]"
- In a 2025 meeting with its parent firm, PlayPower executives reported "[redacted]"
- In requesting PlayPower's approval of a discount in 2025, a PlayPower sales representative stated that "[redacted]" PlayPower [redacted]
- For the South Region of PlayPower's Miracle brand, one of the main things that PlayPower was doing to drive sales in 2024 was "[redacted]

[redacted]" because "[redacted]"

- In 2024, a PlayPower sales director wrote to a sales representative competing with Burke: "[redacted]"
- In 2024, a then-PlayPower executive wrote that "[redacted]"
- A PlayPower Vice President of Global Sales wrote to PlayPower's CFO in 2021 that "[redacted]"

69. Burke likewise faces robust price competition from PlayPower's brands:

- In 2026, a Burke regional sales manager approved a discount "[redacted]"
- In 2026, a Burke regional sales manager approved a discount so Burke could price "[redacted]"
- In 2025, Burke's Director of Sales and Business Development received approval from Burke's CEO for a "[redacted]" on a project because a sales representative had been "[redacted]"
- In 2023, Burke approved a promotional pricing request for a sales representative because the customer "[redacted]"
- In 2023, Burke won a request for proposal in [redacted] after "[redacted]" in this "[redacted]"
- In 2022, Burke approved a promotional pricing request for a sales representative because the discount "[redacted]"
- In response to a 2022 request by a [redacted] Burke's Director of Sales and Business Development replied, "[redacted]" Burke ultimately [redacted]

70. These ordinary course documents, and others, demonstrate the substantial head-to-head price competition that PlayPower's acquisition of Burke would dim post-transaction.

**C. PlayPower and Burke Compete Intensely on Non-Price Factors**

71. Commercial outdoor playground customers like schools, parks, churches, and daycares value not only competitive pricing but also qualitative factors including manufacturers' innovation, product portfolio, quality, safety, and customer service. Customers want the newest and most innovative commercial outdoor playgrounds, but they also want to ensure those playgrounds are safe for the children who use them. Delivery timing, known in the industry as lead times, from manufacturers to customers is also important. Customers likewise value high-quality equipment that does not require excessive maintenance and, when maintenance is needed, they want quick and inexpensive repairs. For many customers, these non-price factors can be as important as price, if not more so.

72. Rather than follow PlayPower's playbook of growing sales by acquiring rivals, Burke has grown by offering attractive pricing and by excelling in innovation, quality, safety, and customer service. As Burke's CEO described the company's growth plan: "[redacted]" Burke is a "[redacted]" As proof of this innovation, Burke often introduces [redacted] new products each year to beat the competition and win customers.

73. PlayPower, by contrast, has lagged Burke in non-price dimensions, including in quality, service, and innovation. As a then-PlayPower sales executive recognized in 2022, [redacted]" PlayPower's CEO graded PlayPower's design as a "[redacted]" and

product management as a "[redacted]," noting that PlayPower brands "[redacted]" In 2024, a PlayPower sales representative complained after having "[redacted]" because PlayPower "[redacted]" In response, PlayPower [redacted] targeted to compete directly with Burke's designs.

74. Where PlayPower lost share because of its underperformance, Burke has gained it. For a [redacted] playground customer, PlayPower bemoaned that "[redacted]" For two other playgrounds that PlayPower lost to Burke, a Senior Designer at PlayPower reported that "[redacted]" After a PlayPower sales representative reported losing a number of projects to Burke, the sales representative noted that "[redacted]" PlayPower likewise lost jobs to Burke because of PlayPower's lengthy lead times in shipping commercial outdoor playgrounds to customers. For instance, a then-PlayPower Vice President of Global Sales reported that PlayPower lost "[redacted]" to Burke "[redacted]" and [redacted]

75. Nonetheless, customers still benefit from intense non-price competition between PlayPower and Burke. For example, after Burke started offering free installations on parts covered by warranty, PlayPower [redacted]" Retaining former PlayPower customers is a top-level priority for Burke. A Bertram Capital partner implored Burke's CEO to keep service and quality levels up to outcompete PlayPower: "[redacted]" Regarding a [redacted], Burke's CEO explained that they have "[redacted]" Burke's CEO also

emphasized that Burke works hard to keep delivery times low to outcompete PlayPower: "[redacted]"

76. The loss of this vibrant non-price competition threatens tangible harms to customers, including reduced innovation, lower quality, and a decline in customer service.

**D. Harm to Independent Sales Representatives**

77. PlayPower and Burke likewise compete closely to serve as the exclusive post-and-platform commercial outdoor playground manufacturers for independent sales representative firms. Diminished service, lowered quality and innovation, and higher prices resulting from the Proposed Transaction will not just harm those sales representatives but will also flow to the end customers the sales representatives assist in serving.

78. Although independent sales representatives typically do not switch manufacturers, when they do, they often switch from PlayPower to Burke, showing Defendants' close competition. Even if sales representatives do not switch, this competition nevertheless allows independent sales representatives to leverage the presence of one Defendant against the other to secure more favorable terms, including better service and commission arrangements. For example, after a PlayPower independent sales representative met with Burke to discuss shifting their relationship, [redacted] When Burke tried to hire a large PlayPower representative, PlayPower [redacted] Similarly, when PlayPower imposed more onerous terms on Playworld sales representatives following the Playworld acquisition, a number of those representatives switched to selling Burke, leveraging the competition between Defendants to achieve more favorable sales terms.

79. If the Proposed Transaction is consummated, independent sales representatives will have significantly less choice in selecting the manufacturer with which they are so closely intertwined. Indeed, PlayPower's Chief Revenue Officer noted that one of the "[redacted]" of the Proposed Transaction is PlayPower's "[redacted]" In reacting to PlayPower's proposed acquisition of Burke, a PlayPower sales representative reported "[redacted]" PlayPower's CFO expressed glee over the newfound power the combined firm would [redacted]"

80. This diminished choice carries concrete risks for sales representatives. For [redacted] of its sales representatives, PlayPower imposes [redacted] This imposes a significant cost on PlayPower sales representatives contemplating a switch. They would have to be so unhappy with PlayPower that they are [redacted]—to switch to a competing manufacturer. Burke does not have similar clauses. The loss of competition for independent sales representatives caused by the Proposed Transaction risks PlayPower using its increased leverage to impose more stringent non-compete provisions, and potentially other worse terms, on PlayPower's and Burke's independent sales representatives.

## <u>THERE ARE NO COUNTERVAILING FACTORS THAT JUSTIFY THE PROPOSED TRANSACTION</u>

81. Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, and sufficient to offset the anticompetitive effects of the Proposed Transaction. As Platinum Equity (PlayPower's owner) recognizes, the commercial outdoor playground equipment industry is characterized by "[redacted]

[redacted]"

82. Because their ultimate audience is children—who depend on these products for healthy, secure, and enriching play—customers demand commercial outdoor playgrounds that are reputable, safe, and of high quality. Customers are reluctant to gamble on unproven manufacturers that lack the proven safety record of major manufacturers like PlayPower and Burke.

83. Building customer trust and a credible safety record would likely take new entrants or smaller manufacturers that want to expand a substantial amount of time, making near-term entry or expansion unlikely. Those new entrants or expansion-seeking manufacturers may also lack important safety certifications, including from IPEMA. A then-PlayPower Senior Vice President candidly observed that IPEMA certification "[redacted]"

84. Entrants and existing manufacturers also are unlikely to replace the competition eliminated by the Proposed Transaction because they cannot replicate the independent sales representative networks that are vitally important to the manufacturers. The best independent sales representatives—those with years of expertise, credibility, and customer relationships—are already spoken for by PlayPower, Burke, and other major manufacturers. An entrant or expansion-seeking manufacturer typically cannot recruit these high-quality sales representatives to sell their products on an exclusive or near-exclusive basis (whereas major manufacturers like PlayPower and Burke can).

85. As Platinum Equity recognizes, the commercial outdoor playground "[redacted]" Because of the importance of non-price factors like customer service and trust, market participants understand that "[redacted]

[redacted]"

86. Beyond the long and productive relationships independent sales representatives have already established with Defendants, there is also the matter of Defendants' non-compete agreements. Entrants and expansion-seeking manufacturers are unlikely to be able to build robust independent sales representative networks because Defendants bar their sales representatives from carrying competing post-and-platform commercial outdoor playground equipment. PlayPower compounds this barrier further by [redacted]. These barriers foreclose entrants and expansion-seeking manufacturers—particularly those looking to break into or expand in Defendants' core post-and-platform business, which makes up the majority of commercial outdoor playground sales—from selling through these independent sales representatives. Accordingly, in analyzing whether to buy PlayPower, Platinum Equity predicted that the share of niche manufacturers [redacted]

87. Entrants and expansion-seeking manufacturers will also face significant barriers—and delay—in building manufacturing capacity, creating a complete product portfolio, gaining technical and sales expertise, and successfully bidding for group purchasing organization or cooperative contracts. Entry or expansion capable of restoring the substantial competition lost from the Proposed Transaction would likewise require significant time and capital investment to build additional production capacity, further reducing the likelihood of sufficient entry or expansion. Taken together, entry or expansion by existing firms cannot provide a defense to Defendants' anticompetitive merger.

88. Moreover, Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption and evidence of the Proposed Transaction's likely anticompetitive effects. PlayPower has not claimed or shown any merger-specific, verifiable, and cognizable efficiencies arising from its past acquisitions. And, even to

the extent it has achieved any efficiencies, it has not passed along cost savings to customers. There is likewise no evidence PlayPower plans to pass through efficiencies to customers if permitted to consummate the Proposed Transaction.

## VIOLATIONS ALLEGED

### Count I: Illegal Agreement

89. The allegations in Paragraphs 1 through 88 above are incorporated by reference as though fully set forth herein.

90. The Proposed Transaction constitutes an unfair method of competition in violation of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II: Illegal Merger

91. The allegations in Paragraphs 1 through 88 above are incorporated by reference as though fully set forth herein.

92. The Proposed Transaction constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and thereby Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## PRAYER FOR RELIEF

93. Accordingly, Plaintiffs respectfully request:

A. The Court enter the parties' stipulated temporary restraining order;

B. The Proposed Transaction be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45;

C. The Court permanently enjoin Defendants from taking any further steps to consummate the Proposed Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

D. The Court award costs of this action to Plaintiff States, including attorneys' fees; and

E. Plaintiffs be awarded such other relief as the Court may deem just and proper.

Dated: October 19, 2026

Of counsel:

DANIEL GUARNERA
Director
Bureau of Competition
NY Bar No. 5346937

TAYLOR C. HOOGENDOORN
Deputy Director
Bureau of Competition
TX Bar No. 24130794
DC Bar No. 1672463

Respectfully submitted,

*/s/ Nathan Brenner*

NATHAN BRENNER (IL Bar No. 6317564)
Chief Trial Counsel
Bureau of Competition

STEPHEN W. RODGER (DC Bar No. 485518)
Deputy Assistant Director
Mergers IV Division

ALBERT TENG (DC Bar No. 1021115)
ALEXANDER BRYSON (VA Bar No. 85737)
ARTHUR DURST (VA Bar No. 87485)
CHRISTOPHER HARRIS (DC Bar No. 1044088)
CLIFFORD HWANG (DC Bar No. 1722045)
DAPHNE LIN (DC Bar No. 1697526)
ERIC OLSON (DC Bar No. 1708530)
HARRIS ROTHMAN (NY Bar No. 5780283)
WILLIAM SOHN (DC Bar No. 1017274)
JEANANN TABBAA (DC Bar No. 1721110)

*Attorneys for Plaintiff*
*Federal Trade Commission*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General

/s/ Allison Weber
ALLISON WEBER (*pro hac vice* forthcoming)
Assistant Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: allison.weber@azag.gov

*Attorney for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Susan J. Welch*
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
Supervising Deputy Attorney General
SUSAN J. WELCH (SBN 232620)
MATTHEW E. DELGADO (SBN 306999)
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7014
Telephone: (415) 510-4400
Email: Susan.Welch@doj.ca.gov
Matthew.Delgado@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Aric J. Smith*
ARIC J. SMITH (*pro hac vice* forthcoming)
Assistant Attorney General
BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 9th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Aric.Smith@coag.gov
Bryn.Williams@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General of Illinois

*/s/ Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER (*pro hac vice* forthcoming)
Chief, Antitrust Bureau
PAUL J. HARPER (*pro hac vice* forthcoming)
Supervising Attorney, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle St., Floor 35
Chicago, IL 60603
Telephone: (773) 590-7935
Email: Elizabeth.maxeiner@ilag.gov
Paul.harper@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

*/s/ Lucas J. Tucker*
LUCAS J. TUCKER (*pro hac vice* forthcoming)
Senior Deputy Attorney General
SAMANTHA B. FEELEY (*pro hac vice* forthcoming)
Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, NV 89701
Telephone: (775) 684-1100
Email: ltucker@ag.nv.gov
sfeeley@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

KUNAL CHOKSI
Senior Deputy Attorney General

*/s/ Charles G. White*
FRANCISCO BENZONI (*pro hac vice* forthcoming)
Special Deputy Attorney General
CHARLES G. WHITE (*pro hac vice* forthcoming)
Assistant Attorney General
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Email: fbenzoni@ncdoj.gov
cwhite@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF OHIO:

D. ANDREW WILSON
Ohio Attorney General

BETH A. FINNERTY
Section Chief, Antitrust Section

*/s/ Steven A. Oldham*
EDWARD J. OLSZEWSKI (*pro hac vice* forthcoming)
Assistant Section Chief, Antitrust Section
STEVEN A. OLDHAM (*pro hac vice* forthcoming)
Principal Assistant Attorney General, Antitrust Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Fax: (614) 995-0266
Email: Edward.Olszewski@OhioAGO.gov
Steven.Oldham@OhioAGO.gov

*Attorneys for Plaintiff State of Ohio*

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:

DAVID W. SUNDAY, JR.
Attorney General

SEAN A. KIRKPATRICK
Executive Deputy Attorney General
Public Protection Division

*/s/ Tracy W. Wertz*
TRACY W. WERTZ (*pro hac vice* forthcoming)
Chief Deputy Attorney General
Antitrust Section
BRANDON S. SPRECHER (*pro hac vice* forthcoming)
Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: bsprecher@attorneygeneral.gov
twertz@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

FOR PLAINTIFF STATE OF TENNESSEE:

JONATHAN SKRMETTI
Attorney General and Reporter

J. DAVID MCDOWELL
Deputy Attorney General, Antitrust and Scaled Industries Division

*/s/ Tyler T. Corcoran*
TYLER T. CORCORAN (*pro hac vice* forthcoming)
Assistant Attorney General
CHRIS DUNBAR (*pro hac vice* forthcoming)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
Email: David.McDowell@ag.tn.gov
Tyler.Corcoran@ag.tn.gov
Chris.Dunbar@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

WILLIAM D. WASSDORF
Deputy Attorney General for Civil Litigation

THOMAS D. YORK
Chief, Antitrust Division

*/s/ Joshua Ciampi*
JOSHUA CIAMPI (*pro hac vice* forthcoming)
Assistant Attorney General, Antitrust Division
WILLIAM SHIEBER (*pro hac vice* forthcoming)
Senior Staff Attorney, Antitrust Division
BAO CUONG PHAM (*pro hac vice* forthcoming)
Assistant Attorney General, Antitrust Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
Email: Thomas.York@oag.texas.gov
Josh.Ciampi@oag.texas.gov
William.Shieber@oag.texas.gov
Cuong.Pham@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Helen M. Lubetkin
JONATHAN A. MARK
Division Chief, Antitrust Division
HELEN M. LUBETKIN (*pro hac vice* forthcoming)
TRAVIS A. KENNEDY (*pro hac vice* forthcoming)
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Helen.Lubetkin@atg.wa.gov
Travis.Kennedy@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

FOR PLAINTIFF STATE OF WISCONSIN:

JOSHUA KAUL
Attorney General

*/s/ Caitlin M. Madden*
CAITLIN M. MADDEN (*pro hac vice* forthcoming)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

**FILER'S ATTESTATION**

I, Nathan Brenner, am the ECF User whose ID and password are being used to file this Complaint. In Compliance with Civil Local Rule 5-1 (i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: *__/s/ Nathan Brenner__*
Nathan Brenner